# Baltimore & Ohio Southwestern Railroad Company v. F. C. Fox.

1. COMMON CARRIER—*liability of, for safe carriage of live stock.* A common carrier is an insurer for safe delivery of live stock, and as such, answerable for every loss which cannot be attributed to the act of God, the public enemy, or the natural or proper vices of the animals themselves, and, as in the case of loss by the act of God or the public enemy,

the burden is upon the carrier to show exemption from liability, so also it is in the case of loss or death resulting from the nature or vice of the animal. In other words, proof of delivery to the carrier of stock, in live and good condition, and injury or death while in the custody of the carrier, makes a *prima facie* case against it, which may be rebutted by evidence that it provided all suitable means of transportation and exercised that degree of care which the nature of the property required.

2. COMMON CARRIER—*right of, to limit liability.* A common carrier has a right to limit its liability by special contract, and this rule applies to provisions that the shipper shall load, take care of in transit, prevent the escape of, and unload live stock.

3. COMMON CARRIER—*restriction upon right of, to limit liability.* A common carrier cannot by express contract exempt itself from responsibility for a failure on its part, or that of its servants, to exercise ordinary care in the transaction of its business.

4. COMMON CARRIER—*what essential to establish limitation of liability of.* Where a carrier attempts by a document which is both a receipt and a contract, to limit its common-law liability, it is essential that the assent of such shipper to such limitation of liability be shown, and the burden to show this is upon the carrier.

5. INSTRUCTIONS—*should not be mere abstract propositions of law.* Instructions which contain abstract propositions of law not concretely applied to the case, should not, as a general rule, be given, as they frequently have a tendency to mislead the jury.

Action commenced before justice of the peace. Appeal from the Circuit Court of Cass County; the Hon. THOMAS N. MEHAN, Judge, presiding. Heard in this court at the May term, 1903. Affirmed. Opinion filed March 16, 1904.

HENRY PHILLIPS and SHUTT & GRAHAM, for appellant; EDWARD BARTON, of counsel.

CHARLES E. MARTIN, for appellee.

MR. JUSTICE PUTERBAUGH delivered the opinion of the court.

This case was originally brought before a justice of the peace and then appealed to the Circuit Court, where it was tried before a jury, and a verdict and judgment awarded plaintiff for $93.

Appellee is a farmer and stockraiser, living near Philadelphia, a village on the line of appellant's railroad, and for fifteen years had been shipping stock from there to Chicago. On the 19th of November, 1901, he shipped six car-

loads of cattle from Philadelphia to the Union Stock Yards
at Chicago.   The cattle were loaded by appellee in cars
which he himself had examined and found in good condi-
tion except one, which had a hole in the floor, over which
he nailed a board.   At the time of the shipment, appellee
signed in duplicate a shipping contract which recited in sub-
stance, among other things, that shipper had delivered to
carrier 103 head of cattle, shipper's load and count, con-
signed to Alexander, Ward & Conover, Union Stock Yards,
Chicago, Illinois, in six Illinois Central cars, to be carried
from Philadelphia, Illinois, to destination, upon the follow-
ing terms and conditions, which were admitted and ac-
cepted by the said shipper as just and reasonable, viz : that
said shipper or the consignee was to pay the freight thereon
to the said carrier at the rate of twelve and one-tenth cents
per 100 pounds, which was the lower published tariff rate
based upon the express condition that the carrier assumed
liability on the said live stock to the extent only of the
agreed valuation of seventy-five dollars each, upon which
valuation was based the rate charged for the transportation
of said animals, and beyond which valuation the said carrier
should not be liable in any event; that said shipper was at
his own sole risk and expense, to load and take care of and
unload said stock, and that said carrier was not to be under
any liability or duty with reference thereto, except in the
actual transportation of the same; that the shipper was to
inspect the body of car or cars in which said stock was to
be transported, and satisfy himself that they were sufficient
and safe and in proper order and condition, and that the
carrier should not be liable on account of loss or injury by
reason of alleged insufficiency or defective condition of said
cars; that shipper should see that all doors and openings
in said cars were at all times so closed and fastened as to
prevent the escape therefrom of any of said stock, and said
carrier should not be liable on account of the escape of any
of said stock from said cars; that no claim for damages
which might accrue to the said shipper under the contract
should be allowed or paid by the carrier or sued for in any

courts by the said shipper, unless a claim for such loss or damages should be made in writing, verified by the affidavit of the said shipper or his agent, and delivered to the general freight agent of the said carrier at his office in the city of Cincinnati, Ohio, within five days from the time said stock was removed from said cars; that the shipper acknowledged that he had the option of shipping the above described live stock at a higher rate of freight, according to the official tariffs, classification and rules of said carrier, thereby receiving the security of the liability of the said carrier, as common carrier of said live stock, but that he had voluntarily decided to ship same under said contract at the reduced rate of freight above mentioned. One copy of the contract was furnished to appellee and by him delivered to his two men who accompanied the stock.

The train upon which the cattle were shipped, left Philadelphia about three o'clock in the afternoon and arrived at the Chicago Stock Yards at about seven o'clock the next morning. The evidence tends to show that 103 head of cattle were loaded at Philadelphia and that but 102 head were delivered to the consignees of appellee at the Stock Yards. Assuming that 103 head were loaded, as claimed, one animal must have escaped from the car in which it was loaded, or the custody of appellant, either while in transit or after the train arrived in Chicago and before the delivery to the consignees. It is not contended that more than 102 head were received by them. As to how or when, or where the missing animal escaped from the car, or the custody of appellant, the evidence does not disclose. The evidence does tend to show, however, that the cars were kept carefully sealed while in transit, and it is probable that the animal escaped, if at all, after the arrival of the train in Chicago. The evidence further tends to show that two men representing appellee accompanied the train for the purpose of looking after the stock, and that they were furnished free transportation by appellant. One of them, Hinchee, testified that they rode in the caboose; that upon being notified by the conductor of the train that they had

arrived at the Stock Yards, they left the caboose and went to the cars containing the cattle but that they had already been unloaded.

Appellee sued to recover the value of the missing animal. No claim was made and no evidence produced affirmatively showing that appellant was guilty of any specific negligence nor that the cars in which the cattle were transported were in any way defective. The case was tried on the theory that the consignees received one animal less than appellee loaded in the cars at Philadelphia, and that nothing but the act of God or the public enemy could relieve appellant from liability. The court adopted this theory and adhered to it throughout the trial.

The principal questions presented for our consideration and determination, and which are essentially the controlling ones are, first, the liability of a common carrier as to live stock in the absence of an express contract limiting the same; second, the validity of the special provisions of the contract executed by appellee; and third, whether or not appellee had knowledge when he executed the contract, that such special provisions were therein contained—the latter question being one of fact and the two former, of law. Our conclusions upon these questions will dispose of the contention of appellant that the court erred in its rulings upon the instructions.

In Burke v. U. S. Express Co., 87 App. 505, we stated the rule relative to the liability of a common carrier as to live stock, to be as follows: "A common carrier is an insurer for safe delivery of live stock, and as such answerable for every loss which cannot be attributed to the act of God, the public enemy, or to the natural or proper vices of the animals themselves, and, as in the case of loss by the act of God or public enemy, the burden is upon the carrier to show exemption from liability, so also it is in the case of loss or death resulting from the nature or vice of the animal. In other words, proof of delivery to the carrier of stock, in live and good condition, and its injury or death while in the custody of the carrier, makes a *prima*

*facie* case against it, which may be rebutted by evidence that it provided all suitable means of transportation, and exercised that degree of care which the nature of the property required." This seems to be the well-settled rule in cases where animals are killed or injured while in the custody of the carrier. Had the animal in question in the suit at bar, been injured, killed or died while in custody of the carrier, it could have successfully rebutted the *prima facie* case against it, by proof that it had provided all suitable means of transportation and had exercised that degree of care which the nature of the property required. If it be true, however, that it escaped from the custody of the carrier, although the vitality of the animal necessarily contributed thereto, the action and cooperating cause of the escape must be presumed to have been the negligence of the carrier, in which case it would be liable for its value, unless relieved therefrom by proof to the contrary, or by the terms of the shipping contract.

It is well settled that a common carrier has a right to limit its liability by special contract (Baxter v. L. N. A. & C. Ry. Co., 165 Ill. 78) and this rule applies to the provisions that the shipper shall load, take care of in transit, prevent the escape of, and unload live stock. (I. C. R. R. Co. v. Hall, 58 Ill. 409.) A provision limiting the time within which a claim may be made and fixing the manner and place of making it, is also valid and binding. (B. & O. S. W. Ry. Co. v. Ross, 105 App. 54.) In Chicago and Northwestern Railway Co. v. Chapman, 133 Ill. 107, the court, in discussing the right of a common carrier to exempt itself from liability for negligence by express contract, says:

"A common carrier cannot, even by express contract, exempt itself from liability resulting from the gross negligence or wilful misconduct committed by itself or its servants or employes. Whatever may be the rule elsewhere, in this state the common carrier cannot contract for exemption from responsibility for a failure on its part, or that of its servants, to exercise ordinary care in the transaction of its business. If the carrier may by contract limit its lia-

bility for gross negligence or wilful misfeasance to any extent, it may contract for total exemption.  A contract for exemption from liability for its torts being void, as against public policy, it cannot shield itself as to any portion of the damages to person or property occasioned by its gross negligence or wilful misconduct.  As we have seen, it may protect itself against fraud by requiring the consignee to state the value of the thing shipped; but when it receives property for transportation it must exercise reasonable care until it reaches its place of destination, and will not be permitted to absolve itself from that responsibility."

The foregoing language is quoted with approval in the case of C. & N. W. Ry. Co. v. Calumet Stock Farm, 194 Ill. 9.

Counsel for appellant insist that the rule applies only where the negligence is gross or wilful, and that a carrier may contract against negligence of a lesser degree.  In support of such contention they cite the case of Arnold v. I. C. R. R. Co., 83 Ill. 273, in which the rule is stated as follows :  " The doctrine is settled, in this court, that railroad companies may, by contract, exempt themselves from liability on account of the negligence of their servants, other than that which is gross or wilful."  While the language quoted has been authoritatively held in a number of cases to state the proper rule, we are of opinion that it is more comprehensively stated by the language of the court in the Chapman case, *supra*, " that the common carrier cannot contract for exemption from responsibility for a failure on its part, or that of its servants, to exercise ordinary care in the transaction of its business."  To permit this to be done would be contrary to public policy.  (I. P. & C. R. Co. v. Allen, 31 Ind. 394, and note page 397.)  It follows that if the loss of the animal was the result of a want of reasonable and ordinary care on the part of appellant, it would not be exempted from liability therefor, by any stipulation contained in the shipping contract in evidence.

It is also contended that the contract limiting the liabil-

ity of appellant, which, in its entirety, constitutes both a receipt and contract, is not binding upon appellee, for the further reason that there is no evidence in the record that appellee assented thereto. In C. & N. W. Ry. Co. v. Simmons, 160 Ill. 648, the court says: " Where a contract limiting the liability of the carrier is contained in a bill of lading, which, in its entirety, constitutes both a receipt and contract, the *onus* is on the carrier to show the restrictions of the common law liability were assented to by the consignor. And whether there is such assent is a question of fact. The mere receiving the bill of lading, without notice of the restrictions therein contained, does not amount to an assent thereto."

Appellee testified that when he went to the station of appellant, the paper lay on the desk and that he signed it; that nothing was said as to the value of the stock or as to any different rate than that mentioned in the paper, nor was there any other or different rate posted in or about the station that he saw; that his attention had never been called to any different rate, and that he knew of no other. He admitted that he received duplicates of the bill of lading but claimed that he turned them over to the men who went in charge of the stock, as transportation. While he further admitted that he had been shipping stock off and on for fifteen years and on each and every occasion had received duplicates of the shipping contract, it cannot be said that the greater weight of the evidence showed that he assented to the provisions of the contract restricting the common law liability of appellant.

Our views as to the law applicable to the undisputed and clearly established facts in the case, render it unnecessary for us to discuss the numerous errors assigned relative to the instructions given by the court at the request of appellee. We will say, however, that several of them are subject to criticism in that they are but abstract propositions of law. Notwithstanding such instructions may correctly state the law, if not directly applied to the alleged facts in the case, they frequently have a tendency to mislead the

jury, and should rarely, if ever, be given.   A number of appellee's instructions are subject to further criticism and should have been refused, but, by applying the law as herein expressed, it will be readily seen that the error was harmless.   The same may be said as to the rulings of the court upon the admissibility of evidence, and appellant's refused instructions.

The judgment of the trial court should be, and is affirmed.

*Affirmed.*